## WILSON *v.* TESSON and Another.

The act "to authorize the business of general banking," approved *May* 28, 1852, was repealed by that of 1855, upon the same subject.

Banks organized under the former act, refusing to comply with the provisions of the latter, ceased to exist as corporations at the time therein prescribed; and no judgment of forfeiture was necessary, to terminate their corporate powers.

A contract made by the officers of such bank, in their corporate capacity, after its powers as a corporation had ceased, does not bind the stockholders.

WILSON
v.
TESSON.

Monday,
May 30.

APPEAL from the *Marion* Circuit Court.

PERKINS, J.—Suit against the *Bank of the Capital* as a corporation, organized in 1854, under the act of 1852, and *Andrew Wilson*, as a stockholder therein, to recover a debt contracted by the bank, in the course of banking business, in *September*, 1857.

Answer by *Wilson* in eight paragraphs, one of which alleged that said *Bank of the Capital* had never assumed to comply with the requirements of the act regulating general banking, passed in 1855.

The bank made default. A demurrer to *Wilson's* answer was sustained, damages were assessed, and final judgment against the bank and *Wilson*. *Wilson* appeals.

The case turns upon the question whether the bank had power to continue its general banking business after the coming into force of the act above mentioned, of 1855.

The general banking law of 1852, under which the *Bank of the Capital* was organized, contained this provision:

"The legislature may, at any time, alter or repeal this act," 1 R. S. p. 160, § 32. It was in the power, then, of the legislature to terminate the existence of banks, created under said act, at its pleasure; as it will scarcely be denied that a repeal of the law would work such termination.

The right to bank as a corporation was a franchise granted by the legislature—when the franchise was taken away the right ceased. And if the legislature could unconditionally terminate the existence of the banks by a repeal of the law, it could impose conditions upon whic' they might continue to exist.

It is admitted that the reprinting or reënacting of an existing section of a law, or of an entire statute, without material alteration, will work no change in the law. Ind. Dig. 865. But if the latter section or statute materially differs from the former, it repeals it. The latter becomes the law.

In 1855 the legislature did repeal the banking law of

1852; for that body amended that law by substituting a new act, covering all of the ground of the act of 1852, and also, much additional. And, as we have said, when the legislature amends a section of an existing law, or the entire law, by substituting an entirely new, and substantially different section in its place, the former section is repealed, and the latter becomes the law. In this case the legislature amended an entire existing statute, by substituting an entirely new, and substantially different, statute in its stead. It was as if the legislature had first expressly repealed the banking law of 1852, and then enacted the law of 1855. On the repeal of the act of 1852, the powers of the banks organized under it, to do business as corporations, ceased, unless the statute provided otherwise. *The State Bank* v. *The State*, 1 Blackf. 267.—Ang. and Ames on Corp., 2d ed., pp. 128, 667.

The statute did provide otherwise. The 48th section of the act of 1855 reads thus: "Every bank or banking association, organized under the provisions of the general banking law of this state, may, in case it shall immediately after the passage of this act, pay all its circulating notes in coin, upon demand, have until the first day of *March*, 1857, to wind up, or accept the provisions of this act." See, also, 1 R. S. p. 240, § 6.

Banks, then, existing under the act of 1852, on the coming into force of the act of 1855, had an election, to refuse to comply with the requisitions of the latter act, cease to do a banking business, and to wind up; or to comply with those requisitions and proceed with their banking business; but they had no power to proceed with such business till such compliance. And if they failed both to comply, and to wind up, it was made the duty of the auditor of the state to wind them up. But it was the duty of the banks to wind up without the interference of the auditor.

The *Bank of the Capital* having failed to comply with the requirements of the act of 1855, had no power to do general banking business in its corporate capacity, after it came into force. We say nothing of its power as a private association.

It is contended by the appellees that its powers continued till a forfeiture was judicially declared. This is not correct. In cases of corporations in whose charter no power of repeal is reserved, and a forfeiture is claimed for misuser or non-user, the doctrine of judicially declared forfeiture applies. *The State* v. *The Vincennes University*, 5 Ind. R. 78. It has no application to cases of a deprivation of power by a legislative repeal, in the exercise of an unconditional right reserved. The officers of the bank, in this case, then, having assumed to make a contract, in their capacity as such, which they had no power to make, the stockholders are not liable upon it as corporators.

*Per Curiam.*—The judgment is reversed with costs. Cause remanded for further proceedings in accordance with this opinion, if by amendment or proof the case can be brought within it.

*L. Barbour* and *J. D. Howland*, for the appellant (1).

*J. L. Ketcham, I. Coffin*, and *W. W. Wick*, for the appellees (2).

(1) Counsel for the appellant submitted the following argument:

There is really but one question presented by this record. It appears in various forms—upon the complaint, the answer, the evidence, and the motion for a new trial. All result in this: Did the free banks, organized under the act of 1852, continue as subsisting corporations after the act of 1855 became the law? Or, at most, did such of these banks as did not comply with the requirements of the latter act, continue to exist as corporate bodies, after the first day of *March*, 1857?

We assume the following positions:

I. Our constitution permits but one system of free banks.

II. The general banking law of 1852 was repealed by the general banking law of 1855.

III. That a bank organized under the act of 1852 had no authority, after the act of 1855 went into operation, to do any banking business beyond what was necessary to wind up its concerns, unless such bank, at some time prior to the first day of *March*, 1857, had accepted and complied with the provisions of the last-named act.

IV. That immediately upon the repeal of the general banking act of 1852, the corporations existing by virtue of its provisions, which had not, within the proper time, accepted and complied with the terms upon which their continued existence was made to depend, expired without any judicial decision determining their existence.

*First.* We conceive it requires no argument to support the first proposition we have advanced. Section 2, art. 11, of the constitution affirms, that "No

banks shall be established otherwise than under a general banking law, except as provided in the fourth section of this article." Section 3 defines the limits and restrictions for such a system, and the fourth section provides for a state bank, with branches. Banks of issue must, therefore, exist by virtue of a general act. This rule of the organic law prohibits the issue of paper, having the similitude of bank notes, by voluntary associations, not organized under the general banking law. See opinion of Judge PERKINS, in *Anderson* v. *Alexander*, in the *Putnam* Circuit Court. The phrase "general" excludes the idea of more acts than one; the law ceases to be general, when it adopts and tolerates two or more systems.

*Second.* The second proposition assumes that the general banking act of 1852 was repealed by the general banking act of 1855. The act of 1855 (Acts of 1855, p. 23, *et seq.*), is entitled "An act to amend an act to authorize and regulate the business of general banking." It proceeds, in the first place, to recite all the old law, after which the following phraseology is employed by the legislature: "Be and the same is hereby amended to read as follows." The act of 1855 then appears section by section, from § 2 to § 56, inclusive. We urge upon the consideration of the Court the force of this language. Suppose a single section of this act, or any other act, were amended by the legislature. The amending act would recite the section proposed to be amended, and proceed, after the phrase, "be and the same is hereby amended to read as follows," to set out the section as amended. What would be the effect of this amendment? We presume it would operate as a repeal of the former section. It would be evidently designed as a substitute for it, and on that ground a repeal by implication would result. But there is more in this language—"shall be amended to read as follows"—than a repeal by implication merely. If the act is to read as follows, it can only be read as follows. The sections following are the law which the legislature authorize the Courts to read, and not the preceding sections, which are recited merely to be amended, and which, if read at all, can only be read for the purposes of construction, as showing what the old law was.

We argue further, that a reading of the act of 1852, and that of 1855, will show that each was designed to cover the whole ground of a general banking system. They prescribe all the steps from the organization of the bank, for its management, its securities, circulation, deposits, reports of its condition, &c., through all the usual details, to its final winding up. Each act, at the time of its adoption was designed to be complete. When the act of 1852 was passed, the legislature, guided by what information they possessed on this intricate and difficult subject, endeavored to make the enactment perfect as far as they were able. A few years experience brought to light various defects in the system, which, for the protection of the public, appeared to need additional guards and securities, and severer penalties. To effect the necessary modifications, two methods were open to the legislature. One was, by selecting such sections as it was necessary to modify, and amend these in conformity with the constitution; and if further sections were necessary, to adopt them. The other method was, to revise the whole act, and adopt a substitute for it. The latter course was the one pursued in this instance, for the whole subject-matter is reviewed, and the legislature, at the time of the passage of the later act, standing where an experience of the defects of the former one had placed them, endeavored to employ this experience by making a new law, covering the whole

subject-matter; in short, the act of 1855 is a revision of the former legislation upon the subject of general banking.

The internal evidence in support of this position is exceedingly strong. To glance at the most prominent feature it presents, the 48th section of the act of 1855 reads thus: "Every bank or banking association, organized under the provisions of the general banking law of this state, may, in case it shall immediately after the passage of this act pay all its circulating notes in coin upon demand, have until the first day of *March*, 1857, to wind up, or accept the provisions of this act."

Here is an express provision in the act of 1855, which contemplates the sweeping consequences which result from a repeal, and provides a remedy. It is as if the legislature had said in express terms—the act of 1852 is repealed by virtue of our revision; but it is not the design to destroy the corporations already existing under the act of 1852. Such of them as pay immediately after the revision all their outstanding circulation, in coin upon demand, shall have their period of grace, until the first day of *March*, 1857. During this interval they may close up their business; or, if they so elect, they may conform to the revision. And this temporary continuance of corporate life for the purpose of winding up, and the indefinite extension of that existence, upon conforming to the new law, are derived, not from the act of 1852, but from the act of 1855. Now the intention of the legislature is self-evident. If it were not in the mind of the law-making power to repeal the act of 1852, no amnesty to the banks already existing could have been regarded as necessary.

Again; under the act of 1852, the number of corporators is undefined; it may be one man, or a thousand. But the act of 1855, § 2, declares that the number shall not be less than eleven. The 17th section of the same act reiterates this limitation. Supposing that no repeal was intended, this determination of a number essential to the organization of a corporation, could not affect the banks already organized. On the other hand, if a repeal was intended, the restriction as to number would apply equally to all. In that case, some proviso would be necessary to preserve the corporate existence of the old banks, unless in their reorganization under the act of 1855, they should, while conforming in other respects to that act, conform also in regard to the numbers. As an indication of what was the intent of the legislature, we find in section 17 of the act of 1855, a proviso, that the provisions of that section shall not apply to the banks now in existence, respecting the number of stockholders. This proviso being only necessary in case of a repeal, clearly proves that a repeal was designed.

Nor is there anything in the general law of the state at war with this view. Section 6, 1 R. S. p. 240, provides that "all corporations whose charters shall expire by limitation, forfeiture, or otherwise, shall nevertheless be continued bodies corporate, for three years after the time they would have been so dissolved, for the purpose of prosecuting and defending suits, to which they are a party, and to enable them to settle, dispose of, and convey their property, and divide the capital stock, but not to continue the business for which such corporations were established." This enactment confines the exercise of corporate powers to such purposes as may be necessary for winding up the business of the corporation, and expressly prohibits anything beyond that point.

Turning, then, to an examination of authorities, we propose to confirm these reasonings upon our second proposition.

"It is well settled that a subsequent statute, which is clearly repugnant to a prior one, necessarily repeals the former, although it does not do so in terms; and even if the subsequent statute be not repugnant in all its provisions to a prior one, yet if the later statute was clearly intended to prescribe the only rule that should govern in the case provided for, it repeals the original act." Sedgw. on Stat. and Con. Law, 124.

Can it be questioned that the act of 1855 "was clearly intended to prescribe the only rule that should govern in the case provided for?"

"If a revising statute embrace all the provisions of antecedent laws on the same subject, and reduce them to one system, such revising statute virtually repeals the statutes revised, without any express provision to that effect. The rule is thus laid down in one case: A subsequent statute revising the whole subject-matter of a former one, and evidently intended as a substitute for it, although it contains no express words to that effect, must, on principles of law, as well as on reason and common sense, operate to repeal the former." Smith's Comm., § 786.

*Nichols* v *Squire*, 5 Pick. 167, was a *qui tam* action on a *Massachusetts* statute of 1785, designed for the suppression of lotteries. The Court, in deciding the cause, remark—"We think the statute of 1785, c. 24, upon which the *qui tam* is founded, is repealed, if not by the statute of 1800, yet certainly by the statute of 1817, c. 191, which appears to cover the whole subject-matter of the statute of 1785. By the statute of 1817, the selling of tickets in any lottery not granted or permitted by this commonwealth, is prohibited under a new penalty; and when the legislature impose a second penalty for an offense, whether smaller or larger than a former one, a party cannot be allowed to sue on one or the other at his option. This point of a repeal by implication is supported by authority. Dwarr. on Stat. 673. In the case of *Bartlett* v. *King*, 12 Mass. R. 537, an exceedingly useful statute, passed in 1754, concerning donations and bequests to heirs and charitable uses, was held not to be in force, the legislature having, in 1785, legislated upon the same subject-matter, and omitted to reënact the provisions of that statute."

The same Court, in the case above cited, which was an action to recover a legacy, settle the same principle, under circumstances more nearly analogous to those we are discussing. It was contended on behalf of the executor, that the legacy was within the provincial statute of 28 Geo. 2, commonly called the statute of mortmain, and was, therefore, void. In reference to this statute, the Court say: "It is not, however, very material now to settle the construction of that statute, as we are fully satisfied that it is virtually repealed by the subsequent statute of 1785, c. 51. A subsequent statute revising the whole subject-matter of a former one, and evidently intended as a substitute for it, although it contains no express words to that effect, must, on the principles of law, as well as in reason and common sense, operate as a repeal of the former, according to the case of *Rex* v. *Cator*, 4 Burr. 2026, in which it was decided that a former statute, inflicting a penalty of £100 and three month's imprisonment, on persons enticing away artificers, was virtually repealed by a subsequent statute inflicting £500 penalty and twelve month's imprisonment for the same offense. The same principle was adopted in the case of *The King* v. *Davis*, 1 Leach's Cases, 306. All the subject-matter of the act of 28 Geo. 2, is contained in the statute of 1785. A part only of its restrictions and limitations in the second section is omitted in the latter; and it is very obvious, by

May Term,
**1859.**

WILSON
v.
TESSON.

comparing them, that the legislature considered the latter as a complete substitute and repeal of the former." *The Trustees of Phillips Academy* v. *King, Ex'or*, 12 Mass. R. 546.

The same Court have settled the question that the common law is superseded by statutory enactments, and, in connection with that question, remark—"The question, then, is whether the common law has been superseded by the statute of 1814, and the Court are of opinion that it has been. The whole subject has been revised by the legislature. * * * A statute is impliedly repealed by a subsequent one revising the whole subject-matter of the first." *The Commonwealth* v. *Cooley*, 10 Pick. 37.

It is proper to remark, that in the act of 1852, § 31, the legislature have reserved the right, at any time, to alter or repeal the act. The Supreme Court of *Georgia*, in the case of *The Union Branch Railroad Co.* v. *The East Tennessee and Georgia Railroad Co.*, 2 Law Reg. 303, decide a case of implied repeal, and consider the question whether there is any difference in the legislative proceeding by which an act of incorporation—in which the legislature have reserved the right of repeal—is repealed, and that by which any other act is repealed. "It was urged," say the Court, "that contracts may be made, and rights may vest under an act, and in reliance upon it. This is so; but is just as true of any other act whatever. And he who contracts, or invests under such an act, surely does it with notice, and with a full sense of the risk he takes. What difference, then, is there on principle, between the repeal of such an act, and any other, securing important rights and privileges to the citizen, and which may be repealed? And why any difference in form, or greater solemnities in repealing such an act? We find no such distinction anywhere drawn. The common-law doctrine is, that "every affirmative statute is a repeal by implication of a precedent affirmative statute, so far as it is contrary thereto; for *leges posteriores priores contrarias abrogant*." Dwarr. on Stat. 673.

In the Supreme Court of *New York* a case is decided, where, in an action brought to recover tolls, the defense pleaded was an exemption under the statute. "It is urged," say the Court, "that the defendant was exempt from the payment of tolls by the 36th section of the turnpike act, which was adopted by the act of *March* 12, 1847, and made applicable to plank-roads. But we are of opinion that the act of 1850 repealed the exemptions contained in the turnpike act so far as it was applicable to plank-roads. Both acts affected the same class of persons; but the act of 1850 has peculiar and more stringent provisions than the turnpike act. The 36th section of the turnpike act, before alluded to, exempts 'all persons going to and from a grist-mill for the grinding of grain for family use.' This was probably broad enough to protect the defendant. But the eighth subdivision of § 2 of the act of 1849, inserted by way of amendment (see Laws, 1850, p. 80), introduces several important limitations to the right of exemption. It provides, that to exempt persons going to and returning from a grist-mill, it must be the mill where they ordinarily get their grinding done; the exemption extends to one gate only; the gate must be within five miles of the residence of the person claiming the exemption; he must be going to the mill for the express purpose of getting his grist ground; and such exemption is made to apply only to a plank-road, or such part of a plank-road, as was constructed on an old highway; not, therefore, to a turnpike. Now it must be conceded that repeals by implication are not favored by the Courts; but a subsequent statute repugnant to a prior one repeals it; and

it is laid down in *Daviess* v. *Fairbairn*, 3 How. (U. S.) 636, that if a subsequent statute is not repugnant in all its provisions to a prior one, yet, if the latter statute was clearly intended to prescribe the only rule that should govern in the case provided for, it repeals the prior one. Under this rule, the 36th section of the turnpike act, so far as it applies to plank-roads, is repealed. No man can doubt that it was the intention of the legislature to prescribe certain conditions and limitations to the right of persons going to and returning from mill, when exemption should be claimed on that ground from plank-road companies." 16 Barb. 15.

May Term,
**1859.**

WILSON
v.
TESSON.

The *Board of Trustees of the Illinois and Michigan Canal* v. *The City of Chicago*, 14 Ill. R. 334, is a case in point. "It was provided by an amendment to the charter of the city of *Chicago*, passed in 1847, that when the common council should desire to appropriate land for the use of a street, they should present a petition for the purpose to some Court of record in *Cook* county, or judge thereof, in vacation; that the Court, or judge, should thereupon appoint three commissioners, to inquire into the necessity of the appropriation, and ascertain the compensation to be paid to the owners of the land, and assess the cost of the improvement upon the real estate to be benefited thereby; and that the Court or judge might approve the report of the commissioners, and condemn the land embraced in the street. Under this provision, the corporation, in *February*, 1849, presented a petition to the *Cook* county Court, representing that it had located a certain street, and desired to appropriate the land over which it passed; and praying for the appointment of commissioners, and the condemnation of the land. Commissioners were appointed accordingly; and an order was made in *May*, 1849, approving their report, and condemning the land. A writ of error was then sued out of this Court; and at the *June* term, 1851, the order was reversed and the cause remanded.

"The 'act to reduce the law incorporating the city of *Chicago*, and the several acts amendatory thereof, into one act, and amend the same,' approved *February* 14, 1851, provided that whenever the common council should lay out a street, they should, after giving ten day's notice of their intention to appropriate the land necessary for the same, choose, by ballot, three commissioners to ascertain the compensation to be paid to the owners of the land, and assess the cost of the improvement on the real estate to be benefited thereby; and that the common council might approve the report of the commissioners, and then proceed to have the street opened.

"In *October*, 1851, the Court made a new appointment of commissioners. They made a report to the Court in *August*, 1852; and an order was entered in *February*, 1853, approving of their proceedings, and condemning the land for the purposes of the street. An appeal was taken from the order.

"The application of a few plain principles will dispose of this case. If two statutes are clearly repugnant to each other, the one last enacted operates as a repeal of the former. Dwarr. on Stat. 673.—*The King* v. *The Justices of Middlesex*, 2 Barn. and Adol. 818.—*Bowen* v. *Lease*, 5 Hill, 221.—*M'Quilkin* v. *Doe*, 8 Blackf. 581.—*Commercial Bank* v. *Chambers*, 8 Smed. and Marsh. 9. When a statute is repealed, it must be considered, except as to transactions passed and closed, as if it had never existed. Dwarr. on Stat. 676.—*Kay* v. *Goodwin*, 6 Bing. 581.—*Surtees* v. *Ellison*, 9 Barn. and Cress. 750.—*M'Quilkin* v. *Doe*, 8 Black. 581. The repeal of a statute conferring jurisdiction, takes away all right to proceed under the repealed statute, even in suits pending at

the time of the repeal, unless they are saved by a clause in the repealing statute. *Miller's* case, 1 W. Blacks. 451.—*Butler* v. *Palmer*, 1 Hill, 324.—*Springfield* v. *The Overseers of Highways*, 6 Pick. 501.—*Matter of Road in Hatfield Township*, 4 Yeates, 392.—*Hunt* v. *Jennings*, 5 Blackf. 195.—*The Commonwealth* v. *Beatty*, 1 Watts, 382.—*Fenelon, &c.*, 7 Barr, 173. A subsequent statute, revising the whole subject of a former one, and intended as a substitute for it, although it contains no express words to that effect, operates as a repeal of the former. *Bartlett* v. *King*, 12 Mass. R. 537.—*Towle* v. *Marrett*, 3 Greenl. 22.—*Nichols* v. *Squire*, 5 Pick. 168.—*Pulaski County* v. *Downer*, 5 Eng. 588."

In another part of the decision, the Court remark, after pointing out the conflict between the two acts—"In this respect the two acts are plainly repugnant to each other; and the last by necessary implication, operates as a repeal *pro tanto* of the former."

*M'Quilkin* v. *Doe, supra*, was a case arising on the construction of the road laws of 1822 and 1824. The Court say—"All we now decide is, that the road law of 1822, at all events, ceased to exist after that of 1824 went into operation. These road laws were clearly repugnant to each other, and there is no reason shown why the first should not be considered as repealed by the last."

Preliminary to the comparison of the two enactments, we call the attention of the Court to the cases of *Norris* v. *Crocker*, 13 How. 429, and *The Peru and Indianapolis Railroad Co.* v. *Bradshaw*, 6 Ind. R. 146.

The repugnancy between the act of 1852 and that of 1855 will appear from the method of comparison sanctioned by these authorities:

1. Secion 1 of the act of 1852 leaves the number of corporators indefinite. It may be composed of one or any number of persons.

Section 2 of the act of 1855 provides that the association shall be composed of not less than eleven persons.

2. Section 1 of the act of 1852 requires no residence in the state for the corporators.

The corresponding section in the last act requires that a *majority* of the shareholders shall be residents of the state.

3. Section 3 of the act of 1852 restricts the issue of bills of a less denomination than five dollars to one-fourth of the whole issue. The act of 1855, § 4, restricts these issues of small bills to one-twentieth of the whole circulation.

4. Section 5 of the act of 1852 makes no limitation upon the amount of stocks or bonds to be deposited, as securities for the redemption of the circulation, with the auditor of state. The corresponding section, 6, of the act of 1855, limits the sum to be deposited as security to an amount not less than 50,000 dollars.

5. By the act of 1852, notes may be issued by the auditor to an amount equal to the par value of the stocks or bonds deposited. The act of 1855 requires 110 dollars of deposit for every 100 dollars of circulation.

6. The act of 1855, § 6, restricts the issue of the circulation to *bona fide* residents, and *bona fide* owners of the deposited stocks or bonds. This is a new feature.

7. The act of 1855 limits the aggregate *circulation* of all the associations formed under it to 6,000,000 dollars; and provides that no association shall have a greater circulation than 200,000 dollars.

8. The act of 1855, § 6, makes the circulation receivable for debts due to

the corporations, and continues this right of set-off for one year after a transfer.

9. Section 8 of the act of 1852, in cases of failure to redeem, and a protest therefor, provides for notice to the makers of the notes. By the last act, this notice is to be given to the president and directors. On such notice by the auditor, the bank has, under the act of 1852, thirty days within which to redeem. By the last act, the payment must be immediate. The act of 1852 makes no express provision for the redemption, by the auditor, of notes not protested. That of 1855 places the non-protested paper, in this respect, upon an equal footing with that which has been protested. The act of 1852 makes the auditor of state the agent, with a discretion as to what method he thinks best, for the purpose of winding up a non-redeeming bank. That of 1855 calls in the governor, treasurer, and secretary of state to assist in winding up, and clothes this board with other powers in several respects.

10. The 6th section of the act of 1855 has two new features: it declares that notes protested shall have no preference over non-protested notes; and requires that all the notes protested at one time shall be included in a single protest.

11. Section 16 of the act of 1852 leaves the amount of bills which the auditor is authorized to countersign limited only by the amount of securities deposited; while that of 1855 restricts the aggregate circulation of all the free banks to 6,000,000 dollars; and that of any one of them to 200,000 dollars.

12. Section 17 of the act of 1852, leaves the number of corporators unrestricted, and fixes the capital stock at not less than 50,000 dollars; leaving the amount of bonds and stocks deposited, and the amount of circulation countersigned and issued upon them without any limit, so that it may be greater or less, by any amount, than 50,000 dollars. The act of 1855, in a corresponding section, reaffirms the rule that the stockholders must number at least eleven, and requires that not less than 50,000 dollars in bonds or stocks, shall be deposited; with, however, the proviso, that the feature as to the number of corporators shall not be made to apply to the banks organized under the law of 1852.

13. The act of 1852, in the second subdivision of section 18, does not fix the population of the place where such bank shall be established; the corresponding subdivision in the act of 1855, prohibits the establishment of a free bank in any place having a population of less than one thousand, unless it be a county seat.

14. The act of 1852 is silent as to any board of directors, and prescribes no residence for the officers. Section 20 of the latter act, requires a board of directors, and that the president and cashier shall be resident citizens of the county where the bank is, or is to be, located.

15. While § 27 of the act of 1852, contains no such provision, the same section of the act of 1855 requires that, in the reports made to the auditor of the condition of the bank, the name, and place of residence of each shareholder shall be stated.

16. In stating what the reports shall contain, the first subdivision of the 27th section of the old law reads thus: "The amount of the capital stock, including that deposited with the auditor, paid in according to the provisions of this act." The new law has a corresponding paragraph, which is in these words: "The amount of stock paid in according to the provisions of this act, and the amount of stocks or bonds, together with a description of such stocks

or bonds, deposited and transferred as aforesaid, as securities for the issues of such association; the then market value of said stocks, as near as the same can be ascertained; the date to which payment of interest has been made upon such bonds or stocks, and whether such interest has been paid to such banking association, or passed to their credit on the books of the auditor."

17. Section 28 of the act of 1852 requires a judicial proceeding to dissolve a corporation organized under it, for failing to make its reports; by the 28th section of the new law, the auditor is empowered to close the association without any judgment.

18. The 29th section of the act of 1855, is a new provision, requiring that a majority of all the stock of each of the free banks shall be owned, at all times, by resident citizens of this state; and it prescribes the mode of ascertaining this fact.

19. The old law, in § 29, provides that, in case any part of the original capital is withdrawn, and dividends continue to be made, while there are debts of the bank unsatisfied, a judgment closing the bank should be rendered. The new law meets this contingency, § 30, by a summary winding up, by the auditor of state.

20. Section 30 of the act of 1852, required certain statements to be filed with the auditor, on the first *Mondays* of *July* and *January* of every year; the same statements, under the new act, must be filed every ninety days.

21. The 34th section of the act of 1855 contains an important new feature: that "every bank organized under the provisions of this act, or the one to which this is an amendment, which shall have accepted the provisions of this act, shall mutually accept the circulating notes of each other, when offered or tendered by any person in payment of any debt or obligation."

It will be seen at a glance that these changes are radical. We invite special attention to but two of them. The old law placed no limits upon the aggregate circulation of the free banks; and none upon the particular circulation of each. They might each issue an unlimited amount—as much as each could purchase or borrow bonds or stocks to secure. They might increase to an indefinite number, till their aggregate circulation became enormous and dangerous. They did so increase; and the sudden and unlimited expansion of their issues having caused the disasters of 1854, was the very evil the new act was framed to remedy. So that act limits the particular circulation of each bank to 200,000 dollars; and the aggregate circulation to 6,000,000 dollars. If, however, the act of 1852 remains in force, and preserves the franchises of those banks organized under it, which have not accepted the new law, what becomes of these restrictions, which do not apply to them? And what becomes of the constitutional inhibition of more than one system of free banks?

Again; the act of 1852 had no provision that the banks organized under it were each to receive the bills of another in payment of debts. But the act of 1855 has such a provision. If both acts remain in force, preserving the vitality of the corporations organized under them, independent of the terms of grace afforded by the later act, here is an incongruity which gives us two systems, and tramples the constitution under foot.

The act of 1855 contains seventeen sections, additional to those we have above compared with corresponding sections in the act of 1852, which further illustrate the incongruity between the two systems. The auditor and treasurer of state are prohibited from becoming stockholders in a free bank, under pen-

alty; the association is required to carry on its business at the place designated in their issues, and where the directors, or a majority of them, reside; it must have a regular banking house, a sign distinctly painted, and regular banking hours; it is made unlawful, under a penalty, for any stockholder, president, cashier, clerk, teller, director, attorney, agent, or other employé of a bank, to buy the bills of any free bank at a discount; it is provided that banks already organized may comply with the new law, either by depositing the additional securities required by it, or by retiring so much of their circulation as will make their securities bear the proper ratio to their issues; 10 per cent. damages are given to the holders of protested notes; when a demand is made for the redemption of the notes of one bank, on behalf of another bank, the redemption may be made with the notes of that bank which makes the demand; when stocks or bonds depreciate 5 per cent., the depositing bank is required to give additional security; and on such depreciation, it is the duty of the auditor of state to receive and retain the interest accruing on the securities in his hands, until further stocks or bonds are deposited; the auditor is forbidden to issue any circulation to a bank, until its owners furnish him evidence that they own taxable property, subject to execution, other than their interest in the bank, within this state, of a value equal to 25 per cent. of the circulation, in lieu of which a bond may be given, to a like amount, as additional security for the issues of such bank; and until this is done, the auditor is required to withhold the interest due the bank; the governor, treasurer, secretary, and auditor, may appoint a bank commissioner, who has complete control given him of the books, safes, papers, &c., of the bank, to enable him to report on its condition, and a penalty is imposed on any one who fails to afford him such facilities; provision is made for continuing banks already existing, on their compliance with the new act; the auditor is directed to wind up any bank violating sections 27 and 30 of the law of 1855; the old banks may have six months within which to re-move their places of business to some point of greater commercial importance; any person violating sections 16, 36, or 47, of the new law, is declared guilty of felony; the violation of sections 39, 41, or 47, is declared a misdemeanor; banks desiring to go into liquidation'are required to give notice by publication, and the mode of canceling its notes, and surrendering its securities, is pointed out; all laws conflicting with the act are repealed; provision is made for agency at *Indianapolis* to redeem in coin, or *New York* exchange; and some minor provisions, which are not here noticed.

The foregoing are, we believe, new features, and certainly give a character to the system so totally different from that of the general banking law of 1852, as to prove that the acts are repugnant. It should not be overlooked that the act of 1855, § 53, declares all laws and parts of laws conflicting with it to be repealed.

*Third.* We proceed now to give some attention to our third point—that a bank organized under the act of 1852 had no authority, after the act of 1855 went into operation, to do any banking business beyond what was necessary to wind up its concerns, unless such bank, at some time prior to the first day of *March,* 1857, had accepted and complied with the provisions of the last-named act. The argument on this proposition has been anticipated in what we have advanced in support of our second point. It will be proper, however, to consider the internal evidence of the intent of the legislature in this respect.

There must have been something meant by the 48th section of the act of

1855, that "every bank or banking association organized under the provisions of the general banking law of this state, may, in case it shall immediately after the passage of this act, pay all its circulating notes in coin upon demand, have until the first day of *March,* 1857, to wind up or accept the provisions of this act: *Provided,* that the auditor shall, in no case, issue any circulating notes to any bank until it shall have fully complied with the provisions of this act: *And provided further,* that if any bank shall fail to pay its circulating notes in coin, it shall be wound up and closed by the auditor pursuant to the provisions of this act." It would seem that no dispute could arise upon the construction of a section so plain as this. But we are driven to scrutinize it carefully, as an index of the meaning the legislature designed to give to the whole statute. Here were a number of banks organized under a system found by experience to be defective; a system created by a statute, in which the right was reserved to the legislature to alter or repeal at pleasure. A new system is devised, with a multiplicity of new features not before known to the law, and the old ones so changed that they cannot be recognized as the same. In the adoption of this new act, the legislature did not wish to destroy the banks already in healthy existence, and to avoid that injustice, they incorporate into the new law the section above quoted. Its object is two-fold. First, to test the solvency of the banks organized under the act of 1852. They must, immediately after the passage of the act, redeem their issues in coin, upon demand; if they fail in this, they are to be wound up without ceremony. If they stand this test of solvency, and desire to continue doing business, they have a season of grace, until the 1st of *March,* 1857, during which they may wind up, or accept the provisions of the new law. And, as if to put the matter beyond doubt, that nothing but winding up or accepting the terms of the law of 1855 was designed, the auditor is expressly prohibited from furnishing circulating notes to any bank, new or old, until it shall have fully complied with the last banking law. The old banks are reduced to this alternative, to pay specie or die on the spot; and paying specie, to conform in all other respects to the act of 1855, or to wind up and get themselves clean wound up and out of the way by the 1st of *March,* 1857. This is every inch of ground left them.

The various other provisions made in this act, for the purpose of opening the door to the old banks, indicates a like intention. It would be obviously unreasonable, if a bank was in a sound condition, and paying specie, to force upon its owners the necessity of bringing new partners into the concern—which they would be compelled to do, if the provision requiring not less than eleven associates was forced upon them. But the legislature avoid this injustice, by a proviso exempting the banks already in existence, from the operation of this rule. But the well known rule of construction derives, from this exception, an added force to all the other conditions. The new act requires that the bank shall be fixed in a county seat, or in a place having not less than a thousand population; another injustice is here avoided, by indulging the old banks with a period of six months, within which to remove their office, should such a removal be necessary. And a special section for their further accommodation is inserted, by which they may establish the new ratio between their securities and their circulation—110 dollars of the former to 100 dollars of the latter; either paying the additional 10 dollars on the hundred to the auditor, or retiring and canceling so much of their circulation as will establish the new ratio. These various provisions, and others which we have perhaps overlooked, either

mean that the subsistence of the already organized free banks depends on a compliance with the new statute, or they mean nothing.

The non-compliance suspends the existence of the bank for all purposes but the purpose of winding up, until the 1st of *March*, 1857, and then the concern is to expire. Winding up—what does this phrase mean? It defines and circumscribes all the remaining functions of the decaying bank. It must have a settled meaning. That meaning can be best understood by looking into the act on corporations, at a section *in pari materia*, which is strictly applicable to these corporations, except as to the term of three years, which it affords for the settling of the affairs of such a body. See 1 R. S. p. 240, § 6. The whole process is defined thus: "For the purpose of prosecuting and defending suits, to which they are a party, and to enable them to settle, dispose of, and convey their property, and divide the capital stock, but not to continue the business for which such corporations were established."

*Fourth.* We maintain that immediately upon the repeal of the general banking law of 1852, the corporations created under it, which had not accepted the terms of the new banking act, expired without the judgment of a Court against them. On the other side, it is insisted that some proceeding, in the nature of a *quo warranto*, is necessary to dissolve these associations.

The elementary writers on this subject, seem to entertain no doubt of the effect of such a repeal. Ang. and Ames on Corp., § 767. The authors seem concerned about these results. "When the legislature has, under a general statute, reserved to itself power to wind up the concerns of banking corporations, those provisions of the statute calculated to apprize all interested of the fundamental change about to be wrought, should be complied with, in order to give legal efficacy to the acts done under it; otherwise, the property of the corporation will not be divested, and its charter will continue in force. It is obvious from the distressing consequences which ensue the dissolution of a corporation, both to its members and creditors, that this reserved right of repeal is one, which, as a matter of policy, as well as of justice, should be exercised with the greatest moderation and caution. It would seem that, sometimes, the Courts are disposed to construe statutes of repeal with great strictness, as if they were in the nature of penal laws. It was upon this ground that the Supreme Court of *Michigan* refused to treat the act of the legislature of that state, repealing the charter of *The Bank of Oakland County*, as an act repealing a charter granted to, and constituting a banking corporation by the name of, '*The President, Directors, and Company of the Oakland County Bank*,' objecting to this want of descriptive certainty in the act of repeal."

We quote this passage, not as applicable to the law as it exists in *Indiana;* for we have a general statute giving all corporations three years in which to wind up; and in the act under discussion, a period is allowed the banks, until *March* 1, 1857; so that all these deplorable consequences are not to be considered in construing this statute. We cite this authority to show what the effects of a repeal are upon corporations, as well as upon individuals.

*Dwarris* expresses the result of the cases in this way: "When an act of parliament is repealed, it must be considered—except as to those transactions passed and closed—as if it never existed." Dwarr. on Stat. 676. See, also, *M'Quilkin* v. *Doe, supra,* and cases there cited; *Mount* v. *The State,* 6 Blackf. 25; *The Trustees, &c.* v. *The City of Chicago,* 14 Ill. R. 334, and cases there cited; Am. Law Reg., vol. 2, p. 303; 2 Kent's Comm. 305, *et seq.*

"We have next to consider the effects of the repeal, which, when it is clear and absolute, are of a very sweeping character. 'The effect of a repealing statute,' says a very eminent judge, 'I take to be, to obliterate the statute repealed as completely from the records of parliament as if it had never passed, and that it must be considered as a law that never existed, except for the purpose of those actions or suits which were commenced, prosecuted, and concluded while it was an existing law.' *Kay* v. *Goodwin*, 4 M. and P. 341. Upon this principle, the repeal of a statute puts an end to all prosecutions under the statute repealed, and to all proceedings growing out of it pending at the time of the repeal." Sedgw. on Stat. and Con. Law, 129, and cases cited.

We respectfully submit that the foregoing examination establishes these propositions:

That under our constitution, there can be but one system of free banks.

That the act of 1852 was designed to cover all the ground and embrace all the provisions necessary to define such a system.

That the act of 1855, containing a recital of the former law, and providing that the act be amended to read as follows, does, *ex vi terminorum*, repeal the act of 1852.

That the act of 1855, proposing to settle all the details of a general banking law, and embracing, with various modifications, all the sections of the former law, with various additional sections, is a revision of the whole subject-matter, and a substitute for the act of 1852; and is designed by the legislature to furnish the only rule upon the subject.

That under the constitution, which permits but one system of this nature, the two acts are entirely repugnant, and cannot co-exist as valid subsisting laws upon the statute-book, and therefore, as well from this inherent incongruity, as from the effect of the repealing clause in the later act, the former is repealed.

That the intent to repeal the act of 1852 is rendered certain by the pains taken by the law-making power, to provide for the continued existence of the banks already created, upon the condition of their accepting the provisions of the new law.

That, in the absence of such conformity on the part of the old banks, they had no corporate powers left, except for the purpose of winding up.

That after the period allowed, either for such acceptance, or such winding up, had expired—that is, after the first day of *March*, 1857, had passed—the banks organized under the act of 1852 had ceased to exist as bodies corporate.

(2) It being understood that the only question urged upon the Supreme Court, is that the act of 1855 (p. 23) repealed the general free banking law of 1852, Messrs. *Ketcham* and *Coffin* submitted an elaborate brief, in which they maintain as follows:

That the legislature did not intend to repeal, is evident, because—

1. The title of the act (last part of § 38) is to "amend."

2. "All laws and parts of laws conflicting with this act (§ 53) are hereby repealed." (Inferrentially, the remainder is not repealed.)

3. Section 17, p. 37—"The provisions of this act shall not apply to the banks now in existence, respecting the number of stockholders."

Section 42—Every bank organized under the law of 1852, may comply with § 6, by adding stock or retiring circulation, &c.

Section 48—Every such bank redeeming its notes as presented, may have to *March* 1, 1857, to wind up or accept the provisions of the new act.

All these sections, and others like them, show that it was not the intention of the legislature to put an end to the banks organized under the law of 1852. But if that law was repealed by the law of 1855, it ended the existence of these banks at once.

The fact is, that prior to the act of 1855, the free bank paper had greatly depreciated. That was the evil. The remedy was, of course, to bring the paper up to par. This was to be done by requiring the banks to add stocks, or retire a part of their circulation, so as to make the proportion of circulation to the stocks as 100 dollars to 110 dollars. See § 6. p. 34, and § 42, p. 44.

But the prompt redemption of the circulation would maintain the paper at par, and § 48 was intended to apply to such banks while retiring their circulation.

Moreover, it is not at all necessary that a bank, under either act, should issue a dollar—or having issued, might retire it all, and still be a bank of deposit and discount. See § 17, p. 27. Compliance with this section organized a bank; but the bank had no circulation until compliance with § 5, p. 24.

It appears, therefore, that a bank of deposit and discount might well exist without any circulation. But the evil was as to the circulation, and the remedy pointed exclusively to that; and the remedy prescribed, and deemed adequate, was the addition of stocks, or retiring a part of the circulation.

Now, with this key to the whole act of 1855 in our hand, let us examine § 48 of this act—

1. The bank is required to pay its notes as they are presented at the counter for redemption. This it does, and, therefore, this part of the section is out of the way.

2. Until new stocks are added, the auditor shall not issue any circulating notes. That is not asked, and, therefore, this part of § 48 is out of the way.

3. The bank not failing to pay its circulating notes, the auditor has no authority or power to wind it up, and this part of the same section is out of the way. The only remaining part of § 48 is, "The bank may have until *March* 1, 1857, to wind up, or accept the provisions of this act."

Now what is to be understood by these alternatives "wind up," or "accept the provisions," &c.?

Still bear in mind, that the evil and remedy relate exclusively to the circulation. To "wind up" means to retire the circulation of the bank. To "accept the provisions," &c., means to give the proportion of notes to the stocks of 100 dollars to 110 dollars, by retiring part of the circulation, or adding stocks. Now, in a case where the bank is proposing to retire all its circulation, and is doing it as fast as the paper is presented (which was the case with this bank), and is not proposing to add any more stocks, when the 1st of *March*, 1857, arrives, has the bank become extinct? What is the section that wields the instrument of death? The most that this § 48 does, is to give day to the 1st day of *March*, 1857, to do the one or the other. But having done neither the one nor the other, what then? Where are the words of forfeiture in all this act, that takes away the franchises of the bank, as a bank of deposit and discount? Where is the section that authorizes the auditor or other power to wind up and terminate the bank. We deny, utterly, that any such termination of a bank in such a case, was ever contemplated.

May Term,
1859.