## Case No. 14,107.
### TOUCEY v. BOWEN.
[1 Biss. 81.] [1]

Circuit Court, D. Indiana.　Nov., 1855.

REMOVAL OF CAUSES—FORMS OF ACTION—FOLLOWING STATE CODE—REMOVED CASE—BANKING—INDIVIDUAL LIABILITY OF STOCKHOLDER.

1. Suits removed from the state courts into the courts of the United States are governed

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

by the rules of the latter courts and must be made to conform substantially to the modes of procedure observed therein as in original cases.

2. But where the state has adopted a code, the plaintiff will not be held to any technical observance of the mere form of action.

3. Under the act of the legislature of Indiana, of May 28, 1852, "to authorize and regulate the business of general banking," and the act of March, 1855 [Laws 1855, p. 23], amendatory thereto, no suit can be maintained against a stockholder in any such bank in his individual character for the payment of any portion of the regular notes issued by such bank and protested for non-payment, until it is shown that the stocks deposited with the auditor of state, to secure the redemption of the circulation are first exhausted, or that the bank is insolvent.

This is a suit instituted by Toucey to recover the amount of certain bank notes issued by the Wabash Valley Bank and protested for non-payment at the place where the bank was located. The defendant is charged as the sole stockholder in the bank, and the declaration alleges that no such bank or banking house is in existence at the place,—Jasper, Dubois county, Indiana,—where the notes purport to be issued and are made payable. The plaintiff, after the necessary allegations to show that Bowen established the institution and put the notes in circulation by virtue of the general banking law of the state, proceeds to charge him, in his individual capacity, for the amount of the notes and damages fixed by the law under which the institution was established. To this declaration the defendant filed a general demurrer.

Dumont & Torbet, for plaintiff.
David McDonald, for defendant.

HUNTINGTON, District Judge.　This proceeding having been instituted in the state court, partakes both of a legal and equitable character—the new Code of Procedure having abolished the distinction between equitable and legal proceedings. In this court this distinction is maintained, and all our proceedings are governed by the principles of the common law, except in cases where we have for convenience adopted a different practice. By an act of congress, a non-resident sued in the courts of the state, may remove his cause to this court, and when it comes here the proceedings must thenceforth be governed by our own forms and rules of procedure. If the suit is in the nature of an action at law, it will take that distinct form here, and, if a purely equitable proceeding, will be governed by the rules of the court of chancery. Some inconvenience will no doubt grow out of this, so far as the mere forms of procedure are concerned, and in some cases it may be necessary to so amend the proceedings as to make them conform to our rules, or in other words, so as to give a distinct legal or equitable character to the proceedings.

The legislature, in abolishing the ancient forms of action, and the distinctions hitherto observed between proceedings in law and in equity, have not touched the old and long sanctioned principles which govern the rights of parties prior to this innovation. It has simply dispensed with certain forms, and the proceedings before the state tribunals are made to conform by operation of law to the nature of the case presented, whether it be legal or equitable.

The case before us is in the nature of an action at law, in form ex contractu, and should the declaration on examination lack any substantial requisite, which, according to the principles governing proceedings in this court, will allow the plaintiff to maintain his action here, the party will be compelled to amend it. In short he must show a cause of action, and in some sort make his proceedings conform to the rules which govern this court, though the court will not hold him to a technical observance of forms, so far as the mere title of the action is concerned. This case then being within our jurisdiction, I proceed to consider it, as if it had been originally commenced here.

There are various objections raised by the counsel who appears in support of the demurrer, some of which it may not be necessary to notice, indeed, if I am right in the view taken of one, and, as I esteem it the important question, it settles the case against the right of the plaintiff to maintain his suit at all, until it is shown that the securities deposited with the auditor of state,—namely the stocks,—have been fully exhausted. It is necessary, in order to a proper understanding of this question, to re-examine somewhat in detail the provisions of the general banking law. The "act to authorize and regulate the business of general banking," was approved May 28, 1852. The first section makes it the duty of the auditor of state, on application of "any person or association of persons," wishing to organize under the act, to cause to be engraved and printed, such quality of notes, in the similitude of bank notes, in blank, of different denominations as may from time to time be needed to meet the demands of these organizations for the purpose of banking. The 5th section provides that any person, or association of persons, formed for the purpose of banking, on transferring to the auditor a certain amount of a certain description of stocks, shall receive from the auditor an equal amount of these notes, &c. The 6th section designates the kind of stocks and securities allowed to be deposited with the auditor. The 8th section is as follows: "In case the maker or makers of any such circulating notes, countersigned and registered as aforesaid, shall at any time hereafter, on lawful demand at the place of business specified in such note, fail or refuse to redeem such note in the lawful money of the United States, the hold-er of such note, making such lawful demand, may cause the same to be protested for non-payment by a notary public, in the usual manner; and the auditor on receiving and filing in his office such protest, shall forthwith give written notice to the maker or makers of such note, to pay the same, and if he or they shall omit to do so for thirty days after such notice, the auditor shall immediately (unless he shall be satisfied that there is a good and legal defense against the payment of such note or notes) give notice in one of the newspapers published in Indianapolis, that all the circulating notes issued by such person or association, will be redeemed out of the stocks held by him in trust for that purpose; and it shall be lawful for the auditor to apply the said trust funds belonging to the maker or makers of such protested notes, to the payment and redemption of such protested notes, with costs of protests, and to adopt such measures for the payment of all such circulating notes, put in circulation by the maker or makers of such protested notes, pursuant to the provisions of this act, as will, in his opinion, most effectually prevent loss to the holders thereof."

On the 3d of March, 1855, the legislature passed an amendatory act, but without materially changing this provision. Before, then, a person or association of persons could procure the notes for banking, they were obliged to deposite an equal amount of stocks with the state auditor, to secure their redemption. These stocks are designated in the act as trust funds, and where any notes were protested, (as in the case before us) for non-payment, and filed with the auditor, the auditor is authorized and directed without delay, to redeem such notes out of these stocks, after thirty days notice to the bank. Can anything be more clear than that these funds were intended to be first applied to the redemption of this circulation, and first of that which had been protested for non-payment? Section 9 of the act, speaks of these stocks as security for the payment of these notes, and the 18th section provides that the notes on their face shall be stamped, "secured by the pledge of public stocks." The 13th section provides that these public stocks shall be held by the auditor "exclusively for the redemption of the bills or notes" put in circulation. But it is said that by the 25th section "every shareholder shall be liable in his individual capacity for any contract, or debt or engagement of such association, to an amount over and above his stock, equal to the amount of his shares of said stock." This is the provision on which the plaintiff rests his right of action, and it is contended that notwithstanding these stocks are still deposited with the auditor and subject to be applied to the redemption of these notes, (for there is no allegation to the contrary, nor any showing the insolvency of the bank) the plaintiff has the right to his election—either

to seek payment by means of the stocks, or have his remedy by action at once against the defendant, who is, it seems, the sole stockholder of this bank. But let us examine it a little minutely. Every stockholder shall be liable individually for "any contract debt or engagement" to an amount over and above his stock, equal to the amount of his shares of such stock. Not one word is said in this section about notes protested for non-payment, though in a certain event they would undoubtedly fall within the meaning of the phrase, "any contract, debt or engagement." The stocks were set apart solely for the security and redemption of the circulation, and could not be used for any other purpose. The individual liability was intended to cover all the engagements of whatsoever nature, which the bank should enter into, to an amount over and above the fund set apart as a trust, to be applied to the prompt redemption of their circulation. And it seems to me clear that such liability was to attach only when the funds of the corporation were exhausted. For by referring to the preceding (24th) section, it will be seen that all persons having demands against one of these banks, should first bring his action "against the president thereof"—in short, against the bank. "And all judgments and decrees obtained or rendered against such president, for any debt or liability of such association, shall be first enforced against the joint property of such association," which property is made subject to rule on execution. The plaintiff perhaps gives a sufficient reason for not suing the bank, as, according to the declaration, it has no place of business, no existence in fact, and if he had gone farther and shown that there were no stocks in the hands of the auditor for the redemption of these protested notes, I think it would be clear that the suit could be maintained against the defendant as a stockholder, for there are no other outstanding liabilities, equal to and over and above his stock.

If the doctrine contended for, by the plaintiff's counsel, can be maintained, there would be no security against innumerable and vexatious suits against individual stockholders, and as many suits might be brought as a man had bills in his pocket, if an unworthy feeling prompted him to protest them at different times for non-payment. Certainly the legislature never intended to open such a door for litigation and oppression; but by requiring a trust fund to be deposited with a state officer, liable at any time to be applied to the redemption of these notes, without suit and without delay, they require that fund to be first exhausted before this individual liability attaches. It is said, however, that the constitution governs the rights of these parties independent of the act. I do not think so. The 25th section of the act is but a transcript of the 6th section of the 11th article of the constitution, and I think warrants no other construction than that just given.

There are several other objections urged against the declaration, but it is not necessary to notice them. This is however a question of some magnitude and great interest, and if it is desired that this opinion be reviewed by the supreme court of the United States,—and I should be gratified if it could be,—the plaintiff can amend, if he thinks proper, his declaration in any particular he desires, so that it may be free from every objection except that just decided, and which goes to the very foundation of the action itself.

This is a question that does not depend on authority, for I have been unable to find in the books, a case which even resembles it; neither the case in 10 Ohio, nor in 8 Cowen, bear upon this question. In the former, the point decided, was that a suspension of specie payment might be carried so far as to work a forfeiture of chartered privileges. The case of Briggs v. Penniman, 8 Cow. 387, cited by the plaintiff's counsel, was a proceeding in chancery by one of the stockholders of an insolvent corporation. The important question in that case was, whether a stockholder in the corporation, liable by virtue of the statute creating the corporation, in his individual character, for an amount equal to the amount of his stock, could be sued by a creditor of the corporation, before its franchises had been taken away by due course of law. It was decided, that the corporation, ceasing to do business as such, and being without funds, was in contemplation of law, dissolved, and therefore the liabilities of the stockholders individually attached.

Demurrer sustained.