## ROWLEY v. POGUE.

[No. 25,994. Filed November 24, 1931. Rehearing denied July 1, 1932.]

*Atkinson* v. *Husselman* and *H. W. Mountz,* for appellant.

*Wood & Wood,* for appellee.

MARTIN, J.—The receiver of the Angola Bank Trust Company brought this action against appellant (who was president and director of the institution) to recover from him the double liability, imposed upon stock-

holders in banks, upon ten shares of the capital stock thereof.

It appears from the special findings of facts that: The Angola Bank Trust Company, because of its insolvency, was closed by the banking department of the State of Indiana on March 14, 1927; for fifteen years prior thereto it was a corporation duly organized and doing business as a loan, trust, and safe deposit company; the state, on relation of a deputy bank commissioner, filed suit in the Steuben Circuit Court alleging such insolvency and praying for the appointment of a receiver, and appellee was appointed receiver and given the usual powers, etc.; appellant, on March 14, 1927, "was the owner in his own right of ten shares of the capital stock of said Angola Bank Trust Company of the par value of $1,000"; the company was indebted in the sum of $608,868.80 to depositors and creditors whose claims have been allowed by the court and the receiver (up to Jan. 5, 1929) had collected and realized from the assets $378,244.48; that the remaining assets after deducting losses will produce $63,346.01 (making the total of all available assets $441,590.49), leaving unpaid to creditors, $167,278.31; certain stockholders have paid on their stock assessment or liability $42,068.06, and the receiver has been paid $44,500 in settlement of a suit for damages brought against certain of the directors, and there still remains unpaid and unsatisfied of the indebtedness of the trust company the sum of $80,710.25. The company was capitalized for the sum of $60,000 and the capital stock was fully paid long previous to March 14, 1927; appellant, although requested to do so, has not paid any sum upon the stock owned by him, and there is due and unpaid from him as the owner of ten shares the sum of $1,000.

The trust company here involved was organized under ch. 161, Acts 1893, p. 344, section 10 of which, as

amended by §3, ch. 20, Acts 1921, p. 44, being §3950 Burns 1926, provides that "Such corporation shall exercise the powers and possess the privileges conferred on banks by the laws of this state and all powers properly incidental thereto or which may be necessary or usual in carrying on the general business of banking, subject to the restrictions imposed by the laws of this state relative to a general banking business, etc." It appears from the record that the company carried on a general banking business.

"The stockholders in every bank or banking company shall be individually responsible to an amount over and above their stock, equal to their respective shares of stock for all debts or liabilities of said bank or banking company." §6, Art. 11, Const. §212 Burns 1926. This section of the Constitution creates a definitely limited stockholder's liability for the benefit of creditors; such constitutional provision is self-executing and the liability may be enforced in an action brought either by a creditor or by the receiver under §4952 Burns 1926, ch. 189, Acts 1915. *Gaiser* v. *Buck* (1931), 203 Ind. 9, 179 N. E. 1. (The action at bar was brought on Dec. 17, 1927, before §4822 et seq. Burns 1926, ch. 215, Acts 1929 became effective.)

It follows that upon the special findings of fact set out above, the conclusions of law that appellee recover from appellant $1,000 and costs and the judgment in that amount against appellant are correct.

The alleged errors which present the questions decided above were assigned on the action of the court in overruling appellant's demurrer to the second paragraph of complaint and on the conclusions of law. Two other questions are presented (1) by the assignment that the court erred in sustaining appellee's demurrer to appellant's third paragraph of answer, and (2) by the assignments that the court erred in overruling appel-

lant's demurrer to the first paragraph of complaint, and in sustaining appellee's demurrer to the second paragraph of answer.

(1) Appellant's third paragraph of answer alleged that prior to the appointment of the receiver the trust company had for a long time been insolvent, and while it was so insolvent, but without any knowledge on appellant's part of that fact, the officers and stockholders solicited him to purchase stock, representing that the company was solvent and the stock reasonably worth its face value; that, relying upon such false representations, appellant agreed to purchase conditionally from a stockholder ten shares of stock with the right to disaffirm the contract of purchase if an investigation of the business should disclose it was not solvent and the stock not valuable; that thereafter appellant (who was elected as director and president of the company and served for more than a month in that capacity) learned of the insolvency of the company and disaffirmed his agreement to purchase the stock and refused to accept the same. Although the court sustained a demurrer to the third paragraph of answer, it allowed the appellant to present his evidence fully on this issue under his general denial. The court found against him on the issue as shown by the finding that "he was the owner in his own right of ten shares," etc. An error in sustaining or overruling a demurrer is harmless where the substantial rights of the objecting party were not affected thereby. 4 C. J. 930. The error, if any, in sustaining a demurrer to a paragraph of answer is harmless where all the facts alleged in such paragraph can be, or are permitted to be, proved under a general denial or other special answer already pleaded. *Henderson* v. *State, ex rel.* (1926), 198 Ind. 608, 612, 154 N. E. 378; *Federal Life Ins. Co.* v. *Sayre* (1924), 195 Ind. 7, 22, 142 N. E. 223; *Washington Hotel Realty Co.* v. *Bedford*

*Stone, etc., Co.* (1924), 195 Ind. 128, 136, 143 N. E. 156; *Indianapolis, etc., Co.* v. *Isgrig* (1914), 181 Ind. 211, 104 N. E. 60; *Perry* v. *Acme Oil Co.* (1909), 44 Ind. App. 207, 88 N. E. 859; *American Express Co.* v. *State* (1906), 167 Ind. 428, 79 N. E. 352; and cases cited in Indiana and North Eastern digests, title, "Appeal and Error," Key number §1040-(7). Available error cannot be predicated upon the action of the court, either in overruling a demurrer to an answer, *Souders et al.* v. *Jeffries* (1884), 98 Ind. 31; *Keegan* v. *Carpenter* (1874), 47 Ind. 597, or in sustaining a demurrer to an answer, *Romy* v. *Brannon* (1903), 32 Ind. App. 146, 67 N. E. 998; *Travelers Ins. Co.* v. *Fletcher, etc., Co.* (1925), 84 Ind. App. 563, 150 N. E. 825, where, as here, there is a finding that the facts alleged in such paragraph of answer are not true.

(2) The first paragraph of complaint (answered by the second paragraph of answer) proceeded upon the theory of the stockholders liability under an assessment made for the payment of debts and liabilities under §4, ch. 161, Acts 1893, p. 344, as amended by §1, ch. 118, Acts 1923, p. 315, being §3944 Burns 1926. This section of the statute concerning trust companies is almost identical with §3858 Burns 1926, §1, ch. 230, Acts 1919, it was enacted in furtherance of §6, Art. 11 Constitution, §212 Burns 1926, and under it the double liability for the benefit of creditors may be enforced against the stockholders of an insolvent banking company in the process of liquidation, as well as assessments to restore the capital stock of a banking company as a going concern. *Gaiser* v. *Buck, supra.*

The first paragraph of complaint contains the necessary allegations for an action at law to collect such assessment for the payment of debts and liabilities, and the special findings of fact set out (in addition to what has hereinbefore been stated) the various steps that

were taken by the receiver relating to the assessment. The judgment as properly follows the findings based on the allegations of the first paragraph of complaint as it does the findings based on the second paragraph. There is no contention that two double liabilities for the benefit of the creditors of the insolvent trust company—one under the Constitution and another under the statute—can or should be enforced against this appellant.

Judgment affirmed.

Myers, J., absent.

### ON PETITION FOR A REHEARING.

*Atkinson & Husselman* of Auburn; *Howard W. Mountz* of Garrett, attorneys for appellant.

*Bachelder & Bachelder; Fesler, Elam & Young; Noel, Hickman, Boyd & Armstrong; Robinson, Symmes & Melson; Korbly & McNutt; Pickens, Gause, Davidson, Gilliom & Pickens; Linton A. Cox, Linn D. Hay* and *Hiram D. Keehn,* all of Indianapolis, Amici Curiae supporting the petition for rehearing.

*C. Severin Buschmann, William W. Hammond, Leo M. Gardner, Homer Elliott,* all of Indianapolis, attorneys for Indiana Bankers Association, Amicus Curiae supporting the decision.

MARTIN, J.—The appellant sets forth in his petition for a rehearing thirty reasons why, or particulars wherein, he believes the court erred in the decision of this case. The first contention made by him and by numerous others as friends of the court, is that the court erred in holding that §6, Art. 11, Ind. Const., §212 Burns 1926, is self-executing. *Amici Curiae,* in overzealous support of the petition for rehearing, say:

"This court has obviously erred in holding either (a) that the Constitution is self-executing or (b) that there is a statutory liability. . . . There is no

reason at all why the entire legislative history of the state and the entire judicial history of the state in this regard should not be now dignified, instead of thrown into the ash can, and that can only be done by the withdrawing from the opinions of this court the incorrect assertion that §6 of Article 11, alone, unaided, can be the basis for a judgment or decree against the stockholders in any proceeding at law or in equity."

In *Gaiser* v. *Buck* (1931), 203 Ind. 9, 179 N. E. 1, 3, we stated that §6, Art. 11, Ind. Const., creates a definitely limited liability on the part of stockholders in banks and banking companies for the benefit of the creditors of such company, that "it is self-executing, there being a manifest intention that it should go into immediate effect and no ancillary legislation being necessary to the enjoyment of the right given or the enforcement of the duty imposed." We further said "It is uniformly held that a constitutional provision imposing double liability on bank stockholders is self-executing." To this last proposition we cited a number of cases from Arizona, California, Illinois, Ohio, Minnesota, Nebraska, South Dakota, Texas, Utah, Wisconsin, and the Supreme Court of the United States, in each of which a constitutional provision quite similar to §6, Art. 11 of our Constitution was involved. Amici Curiae cite seven cases, each involving the interpretation of constitutional provisions unlike our own, which hold that the provisions there considered were not self-executing. One of the cases, *Woodworth* v. *Bowles* (1900), 61 Kan. 569, 60 Pac. 331, pointed out that: "There are constitutional provisions in other states looking to the same end as the one of our own in question, but which, by reason of the difference in language used, have been given a different interpretation from that which ours bears." The Kansas court then quoted the provision contained in the Constitution of Nebraska (which is quite similar

to the Indiana constitutional provision) and said: "In the case of *Trust Co.* v. *Funk,* 49 Neb. 353, 68 N. W. 520, the supreme court of that state, in an ably-reasoned opinion, held the provision quoted to be enforceable without supplementary statutory enactment."

There is no "legislative history" or "judicial history" of this state which limits the self-executing force of §6, Art. 11, Const. All contentions in this regard were fully considered and discussed by the court in its decision of the Buck case, both originally and on the petition for a rehearing, and were also fully re-considered in the decision of this case.

Appellant and Amici Curiae contend that the double liability provision of §6, Art. 11, Ind. Const., does not include the stockholders of a "loan, trust and safe deposit company," (A) because such trust company is not a "bank or banking company" and (B) because "the legislature could not by the amendatory act of 1921 superimpose a liability on stockholders in trust companies whose stock was issued prior to 1921." The Angola Bank Trust Company, and all other trust companies doing business in this state were granted authority in 1921 (§10, ch. 20, Acts 1921, §3950 Burns 1926), to exercise the powers and possess the privileges conferred on banks by the laws of the state and under the power thus conferred it did carry on a general banking business. "The legislature has the power to amend an act under which a company was incorporated, . . . and the exercise of such reserved power of the state does not offend any constitutional rights . . . No condition of acceptance is imposed by the act, but if acceptance were necessary it would be implied from the exercise of the powers granted". . . . *Denny* v. *Brady, Rec'r* (1928), 201 Ind. 59, 61, 62, 163 N. E. 489. No question is presented here as to whether the legislature could by the amendatory act of 1921 su-

perimpose a liability on stockholders in trust companies not doing a banking business. By carrying on a banking business the company in question became a banking company and as such was subject to the regulations of banking companies imposed by the Constitution in relation thereto.

In his motion for a new trial (the overruling of which was assigned as error) the appellant questioned the sufficiency of the evidence to sustain the finding of the court that he "was the owner in his own right of ten shares of the capital stock of said Angola Bank Trust Company." As stated in the original opinion, the appellant presented his evidence fully on this issue and the court found against him on the same. We believe the evidence was sufficient to sustain the finding. There is evidence of the following facts: Claude H. Douglass was employed by the Angola Bank Trust Company for 21 years. Part of this time he was secretary but had been discharged as secretary on instructions of the State Banking Department and for a year had been in charge of the company unofficially as "manager." In the early part of 1927 Douglass talked with appellant, Frank B. Rowley, several times about the purchase of stock in the company and "whether or not he would act as president," the president of the company being ill. Before that time he had talked with a Mr. Beaty about purchasing stock and acting as president. Douglass told Rowley about the condition of the bank—about the large loans. He did not tell Rowley that the company was involved or insolvent, but told him that with proper management and such assistance as Rowley might give, the business could be carried on prosperously. Rowley "finally made up his mind he would act as president and that he would buy $1,000 worth of stock conditionally, with the privilege of returning it in six months if he did not want it." Douglass talked with Mrs. G. R.

(Josie M.) Wickwire, a director of the bank, and then told Rowley that she would sell him the stock. Douglass conducted the transaction between Rowley and Mrs. Wickwire within the next two weeks during which transaction the parties did not meet. He prepared a note for $1,000, which Rowley signed, and then delivered the note to Mrs. Wickwire. She assigned or endorsed her certificate for ten shares of stock in the Angola Bank Trust Company to Rowley, such endorsement irrevocably constituting and appointing Douglass to transfer the stock on the books of the corporation. Douglass took the stock certificate back to the bank, but the stock was never transferred to Rowley on the books of the bank. It was found in a safe in the bank by the receiver when he took charge. At that time the list of stockholders of the bank included Mrs. Wickwire but not Mr. Rowley. The note was in the usual form of promissory notes dated Jan. 20, 1927, and due in six months, with interest at 8%. Written on the back of the note was the following: "The consideration of this note is the sale of ten shares of the capital stock of the Angola Bank Trust Company and it is expressly agreed between the maker and the payee thereof that the said maker is to have the privilege at the maturity of this note to return said stock and receive back this note."

At the meeting of the directors Feb. 5, 1927, Rowley was elected director and president for the ensuing year. After that time he gave attention to the business of the bank and was frequently about the bank. He looked over the notes and sent out notices of past due paper. On Feb. 10, 1927, he presided over a meeting of the board of directors, at which a resolution was adopted authorizing the officers to make a proposal to the State for the selection of the company as a public depository of state funds. He signed the minutes of this meeting as president and thereafter went to Indianapolis and

consulted with someone about having the company selected as a state depository. In appellant's statement of the evidence he sets out a part of his cross-examination as follows: "He was informed he had been elected a director and president of the bank, accepted the duties of the offices and entered upon their performance. His election was reported in the newspapers of the locality. He continued to act as president until the bank closed. Was about the bank looking after its affairs and its general management. He called a meeting of the board of directors for the purpose of passing a resolution to obtain a deposit of state funds. On March 12, 1927, on behalf of the Trust Company, as president, he executed a note for $28,000.00 to the First National Bank of Fort Wayne. He called at the Fort Wayne bank on his return from Indianapolis and was informed the Trust Company had an overdraft and was asked to execute the note to cover it, which he did. From February 5 to March 14, he held himself out as director and president of the Trust Company." In his examination in chief, appellant testified that when he proceeded to examine the securities and assets of the company he found so many notes that he thought were worthless that he called the board of directors together and told them what he had found and the directors "voted to close the bank."

The appellant contends he was not a stockholder because the stock certificate was never delivered to him, and because the stock was not transferred to him upon the books of the corporation, the latter being "necessary to pass the title to appellant and fix his liability as a stockholder." He further says that he was induced by fraudulent representations to enter into the contract to purchase stock, and that as soon as he learned of the fraud and that the bank was insolvent he repudiated the agreement to purchase, and that he can no more be held

to the liability of a stockholder than he could be held liable to pay for the stock. He further contends that Mrs. Wickwire was, and still is, the owner of the stock upon which this action is based and was, and still is, liable for whatever obligations attach to the owner thereof.

The statutes provide that "each director must own at least ten shares of the capital stock," §3946 Burns 1926, and that "the board of directors, at their annual meeting, shall elect from their own number a president," §3948 Burns 1926. Appellant, after purchasing ten shares of stock, entered upon the performance of the duties of director and president and held himself out to the public as such. The creditors of the company had the right to assume that he was a stockholder, and as to them he is estopped, upon the insolvency of the company, to deny the double liability of a stockholder on the ground that fraud was practiced upon him in the sale of the stock. IV Thompson, Corporations (2d Ed.), §§4359, 4923, 4884; *Robinson-Pettit Co.* v. *Sapp* (1914), 160 Ky. 445, 169 S. W. 869; *Commission* v. *Cosmopolitan Trust Co.* (1925), 253 Mass. 205, 148 N. E. 609, 41 A. L. R. 658; *Holyoke Bank* v. *Goodman* (1852), 63 Mass. (9 Cush.) 576. In *Robinson* v. *Sapp, supra,* is was said:

> "In imposing the double liability upon the stockholder, the aim . . . is to secure the creditors of the corporation, and if the real stockholder could avoid liability simply by neglecting to have the transfer recorded on the books of the corporation . . . the security intended for the creditors would be destroyed. . . . The real owner of the stock should sustain the loss, and if the nominal owner of the stock has it to pay he may in such a case recover from the real owner; but the creditor may look either to the transferrer or the transferee."

We cannot in this action determine any issue between appellant and Mrs. Wickwire.

The petition for a rehearing is denied.

Myers and Travis, J.J., dissent.

## ON PETITION FOR REHEARING.
### [March 28, 1933.]

MYERS, J.—I do not approve the prevailing opinion in this case.

The important and major questions in the instant case were made to rest upon the reasoning and conclusions reached in the case of *Gaiser* v. *Buck* (1932), 203 Ind. 9; 179 N. E. 1. The complaint in that case proceeded upon the theory of a double liability of a stockholder in a bank of discount and deposit, under the mandate of the Constitution of Indiana, Art. XI, §6, and also pursuant to the statute, §3858 Burns 1926. The language of that opinion, when read in connection with the allegations of the complaint by a creditor to enforce payment by a shareholder of his proportion of the "debts or liabilities" of a bank of discount and deposit, leads to the inevitable result of declaring a "responsibility" of one hundred per cent under the Constitution, and a "liability" of one hundred per cent imposed by statute. The opinion in the instant case refers to the trust company statute (§3944 Burns 1926) which defines the shareholder's stock liability, the legal effect of which is the same as §3858, *supra*, which applies to banks of discount and deposit. The rule announced in the case of *Gaiser* v. *Buck* is followed in the present case and its meaning clarified by the statement that the Constitution, §6, Art. XI, is the authority for enforcing double liability for the payment of "debts or liabilities" of a bank or banking company, and the statute alone creates the liability and furnishes the remedy for the collection of an assessment for the restoration of the capital stock. The sole premise for declaring liability un-

der the Constitution is the flat statement that §6, Art. XI, is self-executing. I take the position, first, that §6 is only self-executing when applied to the systems of banking described in the Constitution, or if §2 may be so construed as not to be controlled by §3 as to what the general banking law shall contain, then §6 is an inhibition on the General Assembly limiting its power over shareholders of banks or banking companies engaged in a different system to the responsibility restricted by this section. Second, the General Assembly having passed a general banking law under which banks and trust companies have been established, and a new class of banks thereby authorized, we must look to the general law for determining the rights and liabilities of the shareholders in such new institutions and enforce them accordingly, unless they are violative of some provision of the Federal or State Constitutions.

In passing, I may say, the prevailing opinion seems to derive comfort and consider important the statement that "the subject of Art. XI is corporations." It will be observed that Art. XI consists of fourteen sections, twelve of which have to do with two systems of banking, and the other two sections, 13 and 14, together consisting of nearly five lines, are devoted to corporations other than banking. I will not take the space for further comment.

Art. XI, *supra,* includes all of the constitutional provisions in this state on the subject of banking. They express the powers as well as the inhibitions, within their limits, on the General Assembly when engaged in establishing and incorporating banks or banking companies. *None of these provisions refer to banks of discount and deposit, although* the words "discount and deposit" then in use must have been known to the framers of the Constitution. They must have been cognizant of Art. X, Constitution of 1816, wherein the General As-

sembly was prohibited from establishing or incorporating "in this State, any bank or banking company, or moneyed institution, for the purpose of issuing bills of credit, or bills payable to order or bearer." "A state bank and branches," however, was permitted. This Article, under certain conditions and limitations, was practically readopted in Art. XI, §§1 and 3 of the new Constitution. In January, 1834 (Acts 1834, p. 12), a State Bank with ten branches was established. It was a bank of issue and circulation and was to continue in existence until January 1, 1859. A bank of this character was also permitted under the new Constitution. The last legislation on this subject, prior to the Constitutional Convention of 1851, was in January, 1849 (Acts 1849, p. 18), wherein it was provided that no branch banks were to be established after the expiration of the year 1851. The words "discount and deposit," as I am at present advised, came into use in February, 1837 (Local Laws, 1837, p. 169), when the General Assembly established or chartered the Evansville Trust Company, with authority to engage in many activities. It was "made an office of discount and deposit" with permission to receive cash and other valuable things upon deposit, make loans, discount promissory notes, etc., but it was denied the right to *"engage in the business of banking* otherwise than in the purchase and sale of bank stock," and providing that all deposits received by it "shall be refunded on demand in specie, or its equivalent," except special deposits. Again, in January, 1849 (Local Laws 1849, p. 439), the Ohio Insurance Company, located in the city of New Albany, was made "an office of discount and deposit," and given a wide business range, including the right to receive cash on deposit and to loan the same, but it was required to refund such deposits on demand in specie or its equivalent, except special deposits. In compliance with the

Constitution of 1816, Art. X, *supra*, both of the above companies were forbidden to issue bills of credit or bills payable as a circulation medium.

With the foregoing state of facts present, with knowledge of the common law, the mischief to be remedied, and like matters, the Constitution was adopted February 10, 1851, and took effect November 1, 1851. Its provisions with reference to "banks or banking companies" were evidently, from the debates, the decided limit of constitutional control of that subject, and were deemed sufficient to meet contingencies that might thereafter arise justifying constitutional restraint. It will hardly be denied that self-executing provisions of Constitutions are the exception and not the rule. At that time the state had two systems of banking—one requiring collateral security for the redemption of its issue, and the other, a bank with branches without collateral security. *Wright* v. *Defrees* (1856), 8 Ind. 298, 305.

Conceding that Constitutions, Federal or State, are adopted for future uses based upon past experiences, then we must assume that our Constitution makers, in 1851, in the preparation of our present Constitution pertaining to the subject of banking, had in mind the banking history as also the banking systems in this State then in operation, as well as the service they were furnishing, their probable success or failure, as considerations for their final action. Their final conclusion on the subject, at present important, may be epitomized as follows: Sec. 1. The General Assembly is prohibited from incorporating a bank or banking company or moneyed institution of issue and circulation. Sec. 2. "No banks shall be established otherwise than under a general banking law, except as provided in the fourth section of this article." Sec. 3. "If the general assembly *shall enact a general banking law, such law shall provide*" that certain things shall be done and the pro-

cedure to be followed essential to a bank of issue. · Aside from the general banking law to which the General Assembly is· limited by §§2 and 3, it may charter a bank with branches (§4), which branches, under §5, are made mutually responsible for each other's liabilities on all paper credit issued as money. Sec. 6. "The stockholders in every bank or banking company shall be individually responsible to an amount, over and above their stock, equal to their respective shares of stock, for all debts or liabilities of said bank or banking company." Sec. 10. "Every bank or banking company shall be required to cease all banking operations within twenty years from the time of its organization, and promptly thereafter to close its business," and Sec. 12 prohibits the State from becoming a "stockholder in any bank after the expiration of the present bank charter," or lending its credit to any banking enterprise.

In view of these constitutional limitations, the business of banking was confined to individual capital and control. The object of §6, as evidenced by its relation to the sections which precede and follow it, becomes apparent. Only two systems of banking were constitutionally recognized, one under the general banking law and the other established by a General Assembly charter. Both were banks of issue and free to incur· debts or liabilities in addition to those incurred to cash depositors. Sec. 6 was designed to protect the public having dealings with these authorized institutions. At that time there was no constitutional or statutory provision creating the so-called double liability of stockholders in a corporation. Sec. 6 was therefore in derogation of the common law, and it must be strictly construed. The principle governing this section is not unlike that applied to a statute in *Clevenger* v. *Matthews* (1906), 165 Ind. 689, 693, 76 N. E. 542, where it is said: "The right

here bestowed by the legislature, being in derogation of the common law, to be enjoyed, the plaintiff must bring himself, without excuse, fully within the conditions upon which the right rests."

It will also be noticed that prior to 1851 the incorporated companies authorized to receive cash on deposit and to loan the same were not characterized as banks. In the language of the statute creating them "the same (name of the institution) is hereby made an office of discount and deposit." The business of these corporations was greatly diversified, and only a small per cent of which banks were permitted to do. While it may be said that they had some of the attributes of banks, yet they were not so classified or recognized.

The majority opinion notices the case of *Greencastle Township, etc.,* v. *Black* (1854), 5 Ind. 557. Turning to page 570, the court, after considering the case of *Newell* v. *The People* (1852), 3 Selden 9, and the arguments in that case made as to the legal maxims bearing on the construction of written constitutions, said: "Thus it was urged in argument, and so held by the judges, that the discretion of Courts is more restricted in applying the rules of construction to a plan of government contained in a written constitution, than in the construction of statutes. And the reason is conclusive. Statutes are often hastily and unskillfully drawn, and thus need construction to make them sensible. But constitutions import the utmost discrimination in the use of language. 'They are the permanent will of the people, intended for the guidance of posterity.' " The opinion continues with excerpts taken from *Gibbons* v. *Ogden* (1824), 9 Wheat. 1, and *Purdy* v. *The People* (1842), 4 Hill 384. From the Gibbons case: "The framers of the constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they said," and, in the Purdy case, "If

the courts venture to substitute for the clear language of the instrument, their own notions of what it should have been, or was intended to be, there will be an end of written constitutions."

The majority opinion, in my judgment, misinterprets that decision. It fails to take into account any of the rules for construing constitutions as well as statutes. It disregards the admonition that words of a constitution are carefully selected. It lifts §6 out of Art. XI, thereby eliminating the effect of its continuity with other sections, and then proceeds to make it say what, in the opinion of this court, it should have said in order to apply it to institutions manifestly different from those in existence eighty years ago. It transgresses "a rule generally asserted that words or terms used in a constitution which is dependent upon a ratification by the people must be interpreted in a sense most obvious to the common understanding at the time of its adoption, in the belief that such was the sense and meaning designed." *Bishop* v. *The State ex rel. Griner* (1898), 149 Ind. 223, 239, 48 N. E. 1038. Courts are only concerned in what the constitution says and not what it should have said. Immediately following the adoption of the Constitution, the public or people of the state, through legislative action, indirectly at least, determined the field covered by §6, *supra*. They did not understand that §6 said it was to apply to any financial engagement however dissimilar it might be to the banking systems then in use, simply because its name might include the word "bank" or words "banking company" or "trust company." Following the acceptance of the Constitution, the people acted promptly through their representatives constituting the General Assembly, and at its first session thereafter passed the act which was approved May 28, 1852, "regulating the business of general banking" (R. S. 1852, p. 152, §25), and as a part

of that law provided that "Every shareholder of any such association shall be liable in his individual capacity for any contract, debt or engagement of such association, to an amount over and above his stock equal to the amount of his shares of such stock." It must be assumed that the personnel composing the General Assembly at that time were well acquainted with the various provisions of the Constitution, which took effect only a few days prior to their meeting, as also the interpretation placed upon them by the people generally. With that knowledge fresh in their minds, they passed the above double liability statute, a useless thing to do had they thought the self-executing provision of §6 of the Constitution would serve the same purpose.

As further evidence that the people of Indiana did not attribute to §6 the meaning given to it by the late opinions of this court, the words "bank" and "banking company," or the phrase "bank or banking company," so frequently used in Art. XI, should not be overlooked. They are a feature in each section of the Article, and for aught to the contrary appearing, they must be given the same meaning, regardless of the connection in which they are found. *Ryan* v. *State* (1910), 174 Ind. 468; 92 N. E. 340. Their relative application to the particular section and the various sections of Art. XI evinces a purpose to make rules covering the systems of banking then in force, and sanctioned by §§3 and 4. As to all such banks or banking companies, §6 would be self-executing, but I am not ready to concede that court decisions, resting alone upon statutes severally furnishing the procedure in case of the impairment of capital stock and the method and remedy to be pursued in case of individual liability of the stockholder for the payment of debts or liabilities (§§5205, 5151, U. S. Rev. Stats.; *Delano* v. *Butler* [1886], 188 U. S. 634), are authority for holding constitutional provisions self-executing. I

cannot agree that the construction placed upon §6, *supra,* by the prevailing opinion is supported by decisions of courts in other jurisdictions holding constitutional provisions self-executing, when such decisions are based upon general provisions (Art. 12, §2, Constitution of Kansas; Art. 12, §11, Constitution, State of Washington) relative to the liability of stockholders in various corporations.

It will be observed that since 1852 the General Assembly has made many changes in the banking law of this State. In 1855 (Acts 1855, p. 23, §25) the banking law of 1852 was repealed (*Wilson* v. *Tesson* [1859], 12 Ind. 285), but the identical section of the 1852 act pertaining to double liability of shareholders was readopted as a part of the new law. It must be kept in mind that banks of discount and deposit came into existence by virtue of the act of 1873, p. 21. Sec. 13 of this act provided that "The shareholders of each association formed under the provisions of this act, shall be held individually responsible for all contracts, debts and engagements of such association made, contracted or incurred during the time such persons were the owners of a portion of the stock therein, at the par value thereof, in addition to the amount invested in such shares." This statute was amended in 1895 (Acts 1895, p. 202) and again in 1919 (Acts 1919, p. 834; §3858, *supra*), and was the law in force governing statutory liability of bank shareholders at the time *Gaiser* v. *Buck* and *Rowley* v. *Pogue* actions were commenced. This latter enactment, insofar as the same is at present important, provides that "The shareholders of each bank or association formed under the provisions of this act shall be individually liable to an assessment of not to exceed one hundred per centum (100%) of the par value of their respective shares of capital stock, . . ., same to be levied and collected as hereinafter provided *when such assessment is required*

*for the payment of the debts or liabilities of such bank* (my italics) or association or to restore the capital stock thereof. . . . Whenever the capital stock of such bank or association is reduced by impairment or otherwise below the amount required by law or by its articles of association and by certificate of increase or decrease of capital stock, as the case may be, the board of directors shall, at a called meeting or any other meeting, the purpose of which shall have been stated in writing *and notice duly served upon said directors* (my italics) as hereinafter provided more than five (5) days prior to the holding of such meeting, make assessment upon each and every such owner or holder of such stock of such association for an equal amount on each and every share of such stock so owned or held and in an amount or to the extent of not exceeding one hundred per centum (100%) of such capital stock, as may be required for such *purposes* (my italics) and the board of directors of such association shall immediately, upon making such assessment, give notice thereof to each and every such stockholder, in writing, personally or by registered letter, at his last and usual place of residence, as disclosed by the books and records of such association, setting forth in such notice the amount of such assessment and the time given within which to pay such assessment, which time for such payment shall not be less than thirty (30) days nor more than sixty (60) days, and such board of directors failing to make and collect such assessment or failing to carry out the conditions of this act, the auditor of the State of Indiana (now bank commissioner) . . . (may do so), and for (on) failure or neglect of such auditor (bank commissioner) to carry out the provisions of this act, the attorney-general of the State of Indiana shall make such assessment as heretofore provided and collect the same as hereinafter provided or institute proceedings for the appointment of a

receiver for such association and wind up its affairs as provided by law, and such assessment, when so made, shall constitute a lien on such stock to the amount and extent of any and all unpaid balance due on such assessment, including the necessary costs incurred as heretofore or hereinafter provided, and which lien shall attach and be binding until enforced, but not exceeding a period of two (2) years, and which assessment may be collected and such lien may be enforced by said association, either by an action at law or by a refusal to transfer such stock on the books of such association or by sale of such stock as hereinafter provided." Then follows the procedure for the sale of the stock in case that remedy is pursued, and the manner of disposing of the proceeds arising therefrom.

From the language used in this statute, the General Assembly's obvious intention may be drawn in support of conclusions material to the question here involved, that is to say: (1) individual liability of shareholders to an assessment of 100% may be levied when necessary to pay debts or liabilities or to restore capital stock; (2) in case of "such assessment" to pay debts or liabilities, the same procedure—"hereinafter provided" —shall be followed as that provided for in case an assessment is made to restore capital stock, the statute saying, "as may be required for such purposes"; (3) on failure of the board of directors to make and collect such assessment to pay debts or liabilities of such bank or association, the bank commissioner may do so; (4) "such assessment," referring to the assessment to meet individual liability, when made, "as may be required for such purposes," upon notice to such shareholders, will constitute a lien upon such shareholders' stock for a period not exceeding two years, and among the remedies provided by "which assessment may be collected" is "by an action at law." I take it that the General As-

sembly, by the use of the words "by an action at law," in view of the statute making the shareholders individually liable, meant what at common law is known as a personal action in a court of justice for the recovery of private or civil rights.

If §6, Art. XI may be, by construction, declared self-executing as to banks of discount and deposit and trust companies engaged in a field of operation not regarded as the business of banking when our Constitution was adopted, then it should be remembered that there is no constitutional provision for its enforcement. The manner of enforcing liability was left entirely to the discretion of the General Assembly. I don't mean to say that §6 could not be enforced for the omission suggested, but I do insist that the General Assembly, by the 1919 enactment, did provide the procedure for the enforcement of such stockholders' contingent liability, and the method of procedure thus adopted is absolutely controlling. In neither of the cases to which this opinion is directed was there an attempt to follow the procedure pointed out by the statute, and for that reason the complaint in each case was insufficient to state a cause of action. I must not be understood as saying that shareholders of a bank or trust company who voluntarily assess themselves for the purpose of restoring capital stock, or for the payment of debts or liabilities, will be protected from an assessment made in compliance with an order of either the bank commissioner or a court through its receiver. Nor am I unmindful that courts of other jurisdictions have held, in effect, that the General Assembly is inhibited from increasing a shareholder's restricted constitutional liability or lessening his responsibility fixed by a self-executing provision of the Constitution and necessary for the payment of debts or liabilities. As I have said, those decisions rest upon general and unrelated constitutional provisions as well

as statutes, unlike ours, for the regulation and supervision of banks and trust companies. It is the application of the statutes for the enforcement of the assessment that gives rise to the debatable question. I take it that the intention of the General Assembly must govern. This being true, the plain wording of the statute making shareholders "individually liable to an assessment" of 100% of the par value of their capital stock "for the payment of the debts or liabilities . . . or to restore the capital stock thereof" means what it says, one assessment of 100% "as may be required for such purposes"—debts or liabilities or to restore capital stock. The General Assembly, by this statute, has also provided by what power and for what purpose "such assessment" may be made. The power "to levy such assessment," and the application of the proceeds arising therefrom, is primarily confided to the sound business judgment of the bank commissioner who is an uninterested party other than for the best interest of all concerned, and head of the department of banking, which, by the act of 1919, was made a department of the state government and given the exclusive administration of state banks. *State ex rel.* v. *Superior Court* (1931), 202 Ind. 589, 596, 177 N. E. 322.

The statement in the prevailing opinion that the statute, §3858, refers to a bank as a going concern, and §6, Art. XI, to a bank in liquidation, is the result of construction. Neither of these sections speak of a bank in liquidation.

I will notice one other question—action prematurely commenced. There was no showing that the bank commissioner had determined the individual liability of such shareholder and ordered the assessment as provided by the statute for the payment of debts and liabilities, which payment had been refused. To my way of thinking, the additional responsibility of stockholders in a

bank or trust company is what may be regarded as a liability sub-added, and as some courts say, as surety, and others, as a guaranty for the payment of debts and liabilities. Supporting the theory that such liability is secondary, see *Flynn* v. *American Banking & Trust Co.* (1908), 104 Maine 141; *Button* v. *O. S. Stapley Co.* (1932), 9 Pac. (2d ed.) (Ariz.) 1010; *Cowden* v. *Williams* (1927), 32 Ariz. 407; *Wilson* v. *Book* (1896), 13 Wash. 676; *Kirschler* v. *Wainwright* (1917), 255 Pa. St. 525, 534; *Muri* v. *Young* (1926), 75 Mont. 213; *Pyles* v. *Carney* (1919), 85 W. Va. 159, 163; *Marshall* v. *Sherman* (1895), 148 N. Y. 9, 20; *Hirshfeld* v. *Bopp* (1895), 145 N. Y. 84, 92; *Toucey* v. *Bowen* (1855), 1 Bissell 81; *Hanson* v. *Donkersley* (1877), 37 Mich. 184; *Wright* v. *McCormack* (1866), 17 Ohio 86, 95.

In conclusion, it is my opinion that the alleged self-executing provision of the Constitution does not apply to the facts disclosed in the case of *Gaiser* v. *Buck,* or in the instant case, but that the general banking law to which I have referred obtains to make the shareholders of banks of discount and deposit or trust companies engaged in banking activities individually liable to the par value of the stock held by them respectively for the payment of debts and liabilities thereof, when the assessment for that purpose is made in compliance with statutory authority.